Good morning, Your Honors. Gordon Hart on behalf of Sequoia Forestkeeper, the appellant in this case. I'd like to reserve three minutes for rebuttal, if I may. As this Court well knows, the purpose of DEPA, the National Environmental Policy Act, is to ensure that federal agencies will take a hard look at the environmental impacts of their decisions and to foster informed public participation in those decisions. That hard look requirement is not a one-time requirement. There is an ongoing duty of federal agencies to reassess whether or not there has been an adequate evaluation of environmental impacts change before that agency action was implemented. Here, it is Sequoia Forestkeeper's contention that the Forest Service did not take a hard look and did not properly determine that dramatically changed circumstances on the ground existed requiring a supplemental environmental assessment or supplemental EIS under these facts. Here are the basic facts. The Forest Service in 2013 authorized logging of 1,000 acres affecting habitat of a isolated subspecies of mammal called the Southern Sierra Nevada Pacific Fisher, which the record shows is highly prone to localized extinction and is highly sensitive to changes in habitat. Four years later, the Forest Service came to the point when it was ready to authorize the logging to go forward. And they did so despite the fact that during that gap in time, that four-year period, there had been an unprecedented drought and tree mortality event related to both drought-caused insect death and fires that had caused in the Southern Sierra Nevada 66 million trees to suffer mortality. Despite that change and despite the fact that this is a species that is particularly prone to change, the Forest Service did not conduct additional NEPA review. What it did was prepare a non-NEPA document called a Supplemental Information Report. Supplemental Information Reports have been recognized to have a very limited role in documenting an agency's decision to not proceed with further NEPA analysis. The Ninth Circuit has made it very clear in Idaho's supporting Congress v. Alexander that a Supplemental Information Report cannot substitute for a Supplemental Environmental Assessment or a Supplemental EIS. We would contend that the Forest Service is trying to have this non-NEPA document, the SIR, substitute for a Supplemental EA or Supplemental EIS contrary to what the Alexander decision and other decisions have said. Well, I agree they're not equivalent. I mean, the Supplemental Environmental Statement is not equivalent to an EA or a formal EIS, Supplemental EIS. But why can't it satisfy the hard look requirement? It could. We are not claiming that you can't satisfy the hard look requirement through an SIR. So why didn't it here? I mean, they took these aerial photos to see how the they said this is still a project that's a very small area and we still need to do this fire protection and the fissure is threatened by wildfires, too. So why isn't this a very reasonable look? Because it had the service had evidence before it from the Conservation Biology Institute, which were experts that the Forest Service had voluntarily collaborated with, which and in this case, I think it's important to read the passage. It states, there is no available research or direct observations concerning how massive changes in tree cover due to drought and insect mortality, including death and even the largest tree classes, may affect fissure habitat use or population processes. Here's the truly key sentence. There is also no direct evidence indicating how fissures will respond to management actions, read this project, being implemented by land managers in response to this mortality event. So there is a... But then they go on to say, but you need to proceed because we don't know enough to stop you from proceeding. And I assume what they mean is we also realize that if this whole forest burns down, it's going to kill the fissure. So I don't understand. I mean, the Forest Service is really in a bind, right? I mean, they have this problem with fires that needs to be addressed and they tried to figure out how to help the fissure. And it seems like they, as experts, think that this is going to help the fissure, not hurt the fissure. Your Honor, I would, I would not agree completely with the characterization of what they went on to say. What they went on to say is that it's probable that while more data is being There are substantial data gaps and more data needs to be acquired. It's probable that there may be instances where interim forest management practices could assist in the health of the forest. It certainly didn't say, but you should do that without a supplemental environmental assessment. What it in fact said very clearly in the record and in excerpts of record, pardon me, 792, it stated that one of the things that should happen before proceeding is to consider the cost versus the benefit of management alternatives and look for opportunities to modify prescriptions to minimize negative impacts while recognizing that short-term risk may be necessary to meet longer-term conservation and resiliency objectives. That is exactly the kind of analysis that should happen in a supplemental environmental assessment, not in an SIR, that kind of analysis that the experts recommended. Nowhere do they say, we think there is enough information to proceed with a project like the, like the frog management project without doing specific environmental assessment, in fact, they recommended. Well, didn't they also say that there was no data available to measure? It makes evaluation very difficult. You could say that on and on. I mean, you would never, ever be able to log this, what are we talking about, less than a thousand acres because we have to study it some more. I mean, haven't they taken a hard look at this? There is no explanation by the Forest Service as to why that data can't be gathered. And the Conservation Biology Institute is embarking, recommends embarking on a process to gather data and to do that information gathering. The Forest Service has not explained why it is impractical or improbable, pardon me, impractical or infeasible to gather data like that. But isn't it sort of obvious that it's going to take more time and to do a more formal process will take more time? And as I read what they're saying, they're saying, look, we've got a problem right now that we know is a threat to the fisher and everyone else in the forest and the forest itself. And if we don't do something about it, we have a real problem we know of. And you're saying we should postpone dealing with the real problem we know of because of the possibility that there's more data that might show us something down the line. But we could just say that forever because there's climate changing, there's tree death, there are all kinds of things that change what the data might look like all the time. You could just every time say we need more study, we need more study, we need more study. I don't understand where your argument is leading us or how it helps even your own cause. First of all, there is nothing in the record that indicates that the purpose of this project is specifically to conduct management practices designed to save the fisher. Well, but it's forest fire prevention, right? It's forest fire prevention, yes. This project was first proposed in 2001. There's nothing in the record to indicate that there's any imminent need to have this project that's been in the planning processes for 17 years. This is not just the fact that facts could change, might change, that global warming may happen. This is a very specific localized event that has happened and is continuing to happen for at least the next couple of years. Tree mortality event, that specific tree mortality event has impacts on the way that logging will affect the fisher that have not been analyzed. But didn't the Forest Service actually rerun the models using the actual data that had occurred for a particular period? What the model that they reran did not do was it did not take into account future tree mortality. They acknowledge in the SIR that this tree mortality will continue, that they have only looked at the actual data that they found, but made no attempt to plug in and estimate the impact of the future tree mortality on this action. In that respect... Two years or three years from now, couldn't you come back here and say the same thing? We've got to look at the future before we can do anything? Here you have an ongoing event that has a known probable terminus, and that is one to three years of future impact of the drought. We're not saying make guesses about whether or not there will be a new drought. Make guesses about whether or not there will be something speculative in the future. We have a known phenomenon whose impacts are ongoing, and the Forest Service arbitrarily and capriciously decided to truncate its evaluation of that phenomenon and not make any estimates of the future. We would contend that is very similar to the facts in both BABiT and Ocean Advocates. In BABiT, the Park Service had decided to have not made any attempt to quantify what the impacts of increased cruise ships into the beautiful Glacier Bay would be, and the Ninth Circuit said, you know there's going to be some impacts. But here there was data about the tree death that had already happened, so it's not like they ignored the phenomenon entirely. They looked at these satellite photos and everything of the tree death that already happened and said, in the context of this tree death, this project is still not a big impact and it still makes sense to do this project. I mean, yes, you're right, they didn't go the next year in the future, but if they look at it and see that it's not making a difference in the overall calculation and this project is needed, then I don't understand why one more year would make a difference anyway. Your Honor, not the quibble, but it's one to three years. And we don't know whether or not it would make a difference. And the data they were using to run their model was imperfect and full of data gaps, as the Conservation Biology Institute indicated. If I may, I'd like to reserve the remainder of my time for a moment. Thank you. Thank you. May it please the Court, my name is Alan Brabender with the Department of Justice and I'm here on behalf of the United States Forest Service. The Frog Project is an environmentally beneficial project that will benefit the forest and the wildlife, including the Pacific Fisher that occupy it. By thinning overcrowded stands, the project will reduce the risk of mortality due to insects, disease, and severe wildfire. In fact, fisher experts both inside and outside the Forest Service have identified severe wildfire as one of the biggest threats to the fisher and they recommend taking actions like the Frog Project to reduce that threat. Now before the Service approved the project or decided to proceed with the project, it prepared environmental assessments, finding that the project is not likely to significantly impact the fisher or any other resource. And there are good reasons for the Forest Service's recommendation. The project is extremely small. It affects only about 1,000 acres. And to put that in context, 1,000 acres is less than half a percent of the area in Fisher Core Area 2. And Fisher Core Area 2 is just one of seven core areas in the Southern Sierra Nevadas. Not only is the project extremely small, it's of low intensity. We're not talking about clear-cutting, we're talking about removing some small understory trees to reduce fire risk and to allow the remaining trees to grow stronger and healthier due to decreased competition for water, sunlight, and other nutrients. Not only is the project small-scale, low-intensity, its impacts are well understood. The Forest Service has significant experience implementing thinning projects like the Frog Project. And it designed the project from the start to avoid impacting the fisher. It is retaining large trees. It is retaining snags, downed woody debris. And there are operational restrictions in place, again, to minimize any impacts on the fisher in the short term. And in the long term, of course, this project is going to benefit the fisher by reducing the risk of severe wildfire, which is, again, one of the biggest threats to the fisher in the region. Now, in light of the tree mortality caused by the- There was a similar project that the Forest Service decided to not pursue because of the tree mortality, right? Can you explain what the difference was between this one and that one? Sure. You're referring to the Rancheria Project. And there's a couple of things that are different about the Rancheria Project. First, it is south of the Cedar Fire. And the Cedar Fire therefore fragmented that population, the fisher in that area, from the rest of Core Area 2. Whereas the Frog Project is north of the Cedar Fire, and the population there is connected to the rest of Core Area 2. There is also a much higher percentage of CBI high-value reproductive habitat that was affected in Rancheria as compared to the Frog. And so what- And in Rancheria, are they doing a supplemental- What's happening there? I mean, is the project just done, or are they doing more study there? That's a good question. I don't know. They're probably doing a supplemental NEPA analysis, Your Honor. But what this shows is that the Forest Service is just not plowing ahead for the sake of plowing ahead. It is looking at the facts and the science before it and making case-by-case determinations. Now, with respect to the Frog Project, the Forest Service voluntarily stopped the project. It gathered the new data. It reran its simulator. And then it assessed future tree mortality. Plaintiff's position that the Forest Service didn't assess future tree mortality is just plain wrong. I would refer the Court to excerpts of record page 833 and 834. That is the section of the Supplemental Information Report that discusses future tree mortality. So plaintiffs cannot argue that the Forest Service didn't assess future tree mortality. What their argument seems to be, to the best we understand it- It's that they didn't quantify it, right? That's exactly right. They didn't perform a quantitative analysis. And there, of course, there are good reasons for this. Because CBI, this is a non-governmental agency that publishes the Fisher Conservation Strategy, and their document entitled Change Circumstances, which is in the record at 788 to 793, notes that there is a lack of quantifiable data. The data just doesn't exist. But then CBI goes on to say that even if such data did exist, there is a lack of a reliable scientific methodology for translating that data into the future and making predictions on fisher habitat. So what CBI recommended is that land managers like the Forest Service undertake a qualitative analysis. And CBI's recommendation there is at page 793. So that's exactly what the Forest Service did. It followed the advice of CBI and it performed a qualitative assessment of future tree mortality. And probably the next question the Court has is what's a qualitative analysis? And what that is is the Forest Service employed its experts, its biologists, its fisher experts, to look at the best available science out there and to render a scientific opinion. So what the biologists did is they performed a literature review. It noted that the best available data indicates that tree mortality is likely to continue for one to three years into the future after the drought ended in 2016. They then looked at the impact of the past tree mortality, which occurred at lower elevations. They looked at the results of its modeling, which does in fact take into account future tree mortality, but sort of normal levels of tree mortality. They looked at the locations of the project, which are at higher elevations, which are not as affected by the tree mortality. And they looked at the treatments that were going to occur. And from all this, the Forest Service biologists determined that the project, even accounting for the future tree mortality, was not likely to significantly impact the fisher. So the analysis was done, and it was the analysis recommended by CBI. So part of the argument seems to be that using the Supplemental Information Report process circumvents the need for an environmental assessment. Can you explain, in other words, it's an end around the formality of an environmental assessment? Well, this Court in Alexander did uphold the use of SIRs. Right. And it's because there has to be some device for the agency to determine whether or not a supplemental NEPA document is required. And the device that agencies use is called at least what the Forest Service uses is called the Supplemental Information Report. I mean, it's essentially, it's a non-NEPA document. It's essentially a memo to the file explaining why supplemental NEPA analysis is not required. So do you have any formal criteria when you elect to use a Supplemental Information Report as opposed to an EA? Or is this just a matter of agency discretion that's somewhat unfettered? It is a matter of agency discretion. And what the Forest Service is, first of all, there's nothing in NEPA that contemplates supplemental EAs. Some federal agencies have regulations that contemplate supplemental EAs, but the plaintiffs have not identified anything that applies to the Forest Service. What the Forest Service manual states, and the manual is a non-binding document, but what the manual states is that a supplemental EA should be prepared when there are new circumstances or changed circumstances that suggest the former EA is invalid for some reason. It's a very sort of subjective standard. Right. So here we have the situation where everybody agrees that there have been changed circumstances, right? Yeah, but the changed circumstances didn't render the 2013 EA to be invalid. And that's the important point, that the conclusion in the 2013 EA remains valid even in light of undertook the analysis in the SIR. It stopped the project. It gathered new data. It reran its simulator. It assessed future tree mortality. And the Forest Service confirmed the conclusion in the 2013 EA that the project's impacts on the fissure remain insignificant at all three of the spatial scales recommended for analysis by CBI. How would it have looked different if they had done an EA in those years when they were re-looking at the data and the tree mortality? I don't know if it would have looked different, Your Honor. Well, I guess that's the question is what triggers an EA? And it seems to me the benchmarks are identical. In other words, you can have any, you have many EAs where they confirm the prior environmental assessments, right? That's true. And some federal agencies decide to proceed that way. But could you just call this an EA? I mean, what makes it not an EA? Is it just a labeling thing or is there actually a difference? In this circumstance, I don't think there is much of a difference, Your Honor. There are, I think, some regulatory requirements that may apply to the preparation of an EA that do not apply to an SIR. But I'm not prepared to identify exactly what those are. I mean, I think that's one of the arguments is that doing an SIR allows you to circumvent the regulatory requirements that may apply to an EA. And I confess I don't know what those are in this context that matter. Sure. But that's the argument. And what I think plaintiffs identify is the public participation requirements. Yeah. But a couple points there is, as this Court held in Bering Strait, the NEPA public participation requirements apply to EISs. They don't apply to EAs. There's nothing that requires, for instance, the Forest Service to release a draft EA for public comment as it would have to do for an EIS. But with that, I see my colleague, Mr. Fite, would also like to present here and yield the remainder of my time. Thank you. Good morning, and may it please the Court. Lawson Fite on behalf of Sierra Forest Products, the intervener, defendant, appellee, and the contractor. I have Mr. Kent Dusin from Sierra Forest Products here. Sierra Forest Products is an important component of the Forest Service's management ability because it's the only sawmill south of Yosemite National Park. And so one of the purposes of projects like these, it's certainly a secondary purpose in a forest restoration project, but it's to ensure that those mills have a steady flow of timber so that they're around, that infrastructure is there, so the Forest Service can continue to manage the landscape and make sure we don't have catastrophic wildfires like some of those that we saw last summer. The core issue here, I think Judge Thomas, you certainly hit on it in your comments at the end of my colleague's presentation, which is, was the Forest Service required to supplement its 2013 environmental impact or environmental assessment. And the test that's articulated in the Tri-Valley Cares case, the opinion by Judge Smith, is really helpful to that. And that adopts the test from the Seventh Circuit, Wisconsin v. Weinberger, and says a supplemental environmental assessment isn't required unless there's a So that properly focuses the inquiry. It also cabins the discretion of the agency. So the agency certainly has discretion and is due deference as to the conclusion it reaches. And here it reached the conclusion there's not a seriously different picture. But that also ensures that it doesn't have unfettered discretion and it doesn't have the unilateral ability to set aside or evade public participation requirements, which certainly may be of concern to the court as well as to the public. Specifically here, the Forest Service looked at the project and determined there wasn't a seriously different change or there wasn't a seriously different picture of the environment. And that had to do with the fact that the need for the project is only intensifying. They looked at the stands and said those stands were overstocked 10 years ago. They're overstocked now. They still are a great risk for catastrophic fire, which is probably the single largest risk to the fisher. And that's a fairly common issue throughout the West, that catastrophic fire is the number one threat to many wildlife species that inhabit our national forests. Do you know if there were procedures or things they would have needed to do if they tried to make that assessment through an EA, like a supplemental EA? What would have looked different if they had made that same assessment that way? There likely would have been different procedures. They would have prepared a full environmental assessment, which is a longer and usually more extensive document than a supplemental information report. The regulations require public involvement to the extent practicable. The Forest Service data also indicates the average time to produce an EA is somewhere on the line of 12 to 18 months, which certainly would significantly delay the project, which has already been delayed several times. Even after Judge Breyer lifted the previous injunction against it in 2013, some limited implementation occurred in 2015, and then it resumed implementation in 2017. But the analysis here certainly satisfied that requirement to take a hard look at what the situation is. Does that require us to go back and do a full environmental assessment? I think if you go back to Marsh and the Supreme Court's opinion that you could get into a cycle of supplementation, and you have to draw a line somewhere that's reasonable. With the Rancheria project that was mentioned, that's where the Forest Service drew a line. They are preparing a supplemental environmental assessment. That project has been suspended since the 2016 suspension of Frog and Rancheria, and so that is still ongoing, that preparation of the assessment. Is there some time sensitivity about this, I gather? Are you planning logging in August? Is that right? Resumption, the project will resume in August. However, some logging occurred in the fall after the district court ruled. The plaintiffs' appellants did not request injunction pending appeal. And then logging will continue under the current plan in the 2019 logging season. I assume there's some preparatory activities that would occur prior to logging in August, so you'd probably have to get in there in July at some point. A little bit before. You have to move up the equipment before trees are actually felled, and there are meetings to plan those operations. But certainly no felling would occur prior to August 1 of this year. Was it why did it stop between the fall and August? If they didn't seek an injunction, I'm a little confused about why it stopped. I'm glad you asked that, Judge Friedland. And that's because of protective measures for the sake of the Fisher. Because of the breeding time and things like that? Yes, exactly. The limited operating periods. Basically, logging ceases oftentimes in the limited operating period, kicks in for a Fisher breeding in February, and then that goes and is lifted in August. And so that measure is in place already for protection of the Fisher, and that applies virtually every project I've seen on this National Forest. I see I'm over my time, so unless there are any further questions, I appreciate the time. Thank you. NEPA is all about process. It represented a congressional determination that particular formal processes should be used before the government takes actions that could affect the environment. There is no such thing in regulation as a supplemental information report. It is an informal method of documenting a decision that has already been made. That is the key difference. But just as a practical matter, what would it have looked like if they had done this as a supplemental EA? I think Mr. Fite made it clear. It is a much longer, larger document that sets forth the environmental settings, sets forth the way the project will change the environmental settings, sets forth the possible impacts. But weren't those sections in this too? I mean, is there a rule that says it has to be 100 pages instead of 50 pages or whatever the length is? I'm just a little confused about what actually wasn't done that needed to be, in your view. In my view, the key difference is that by its very nature, an SIR is result-oriented, and an environmental assessment is supposed to be the opposite. An environmental assessment is supposed to be an aim-first, shoot-later document. Without knowing what the decision is going to be, let's evaluate the impacts. The SIR, on the other hand, is justifying why one is going to shoot. I don't think that's quite correct. I mean, they could have, at the end of the day, said, okay, there are some concerns raised. Let's go through with an EA. What's wrong with saying, let's study it and do a quick analysis and see if our old analysis holds up. But that's not what they did, Your Honor. They didn't do a quick little analysis. They did something that was really a hybrid and really neither fish nor fowl. But that makes it better for you, right? I mean, I think your response is they did more than a quick analysis. No, it really doesn't make it better. What it does is it shows that there should have been an EA. And because there were enough impact, enough potentially significant changes necessary to do these new aerial studies, to run these models again, that almost in and of itself demonstrates that there was enough information that there could be a significant problem to do an EA. And yet, instead, they did this kind of half hybrid document, a kind of enhanced SIR, if you will, when what they should have been doing under the statute is a supplemental environmental assessment. Remember, EAs are the minimum under NEPA. They're not an EIS. They are the minimum, and they didn't even do the minimum. But if you agree, and I think you did earlier, that an SIR can constitute the requisite hard look, why does it matter if we think it's a hard look? Well, we would, I think there needs to be a different standard, a different way of evaluating hard look in the context of a decision not to proceed with a NEPA document than there is in the context of reviewing the NEPA document itself. Because I think that the statute contemplates there will be some supplemental NEPA analysis. And so the, if there's going to be, if it's necessary to take a hard look at an impact, that should be done through a NEPA analysis and not through an SIR. If an SIR is simply going to say, we don't think it's necessary to do it and here's why, then that's what its purpose is. Thank you. Thank you all for your arguments. The case just heard will be submitted for decision and we will take a 10 minute recess.
judges: Thomas, Friedland, Zilly